BEAN v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. January 16, 1912.)

No. 911.

1. BANKRUPTCY (§ 495*)—OFFENSES—EVIDENCE—MATERIALITY—REMOTENESS.

Where, in a prosecution of a bankrupt for alleged concealment and withholding of assets from the trustee, the only substantial evidence

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was that defendant was seen on two occasions removing goods from his store late at night, and a government's witness testified in detail respecting a mortgage executed by the bankrupt on his stock for money loaned, stating when the money was paid and from whom it was obtained, which evidence was uncontradicted, evidence of a conference between the mortgagee and his alleged debtor from whom it was claimed he obtained the money that he loaned to the bankrupt to the effect that he desired the money paid because he had promised to loan it to another was properly excluded for remoteness.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 495.*]

2. BANKRUPTCY (§ 495*)—EVIDENCE—RELEVANCY—REMOTENESS.

Where, in a prosecution against a bankrupt for concealing assets, it was proved that, shortly before defendant's failure, he was seen to remove goods from the back part of his store at night by a witness who claimed to have looked through the back windows, evidence that the windows were equipped with tight shutters, that the shutters were up on November 18, 1909, and that there was no change in keeping up the shutters at night from the time the bankrupt went into the store until January, 1910, though defendant vacated the store in May, 1909, was inadmissible for remoteness.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 495.*]

In Error to the District Court of the United States for the District of Massachusetts.

Louis Bean was convicted of willfully concealing assets from his trustee in bankruptcy, and he brings error. Affirmed.

Samuel W. Emery, for plaintiff in error.
William H. Garland, Asst. Dist. Atty., for the United States.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

COLT, Circuit Judge. The indictment in this case charged the defendant with unlawfully, knowingly, and willfully concealing from his trustee in bankruptcy certain property belonging to his estate in bankruptcy, to wit, "certain choses in action and book accounts," "a large quantity of merchandise," and "certain moneys." At the trial in the court below, Judge Dodge presiding, the jury returned a verdict of guilty. The assignments of error present the single question whether certain evidence offered by the defendant was properly excluded by the court.

The evidence tended to show the following facts: From September 1, 1908, to April 29, 1909, the defendant was a dealer in men's and women's clothing at Ipswich. On April 29, 1909, he filed his petition in bankruptcy, and on the same day was adjudicated a bankrupt. On May 25, 1909, his trustee in bankruptcy was appointed and qualified.

[1] On February 2, 1909, the defendant executed a chattel mortgage to Morris Port to secure a note for $1,500 payable to Port. This mortgage covered the goods and fixtures in his store, and was recorded in Ipswich, but no possession of the property was taken by Port. In June, 1909, these goods and fixtures were sold by the trustee at public auction for $760. With respect to the $1,500 mortgage note, both the defendant and Port testified that $400 was loaned by

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Port to the defendant on September 14, 1908, and the balance, $11,-000, on February 2, 1909. As to the disposition of this money, the defendant testified that he deposited $400 in the Ocean Bank at Newburyport, and used it in his business; that he paid a loan of $350 to his brother-in-law, and $300 to one Hirsch in payment of a note, and that the balance he used in paying bills, but he was unable to state what was paid to any particular person.

The government's evidence tended to show, further, that the defendant continued to buy goods up to April 22, 1909; that in February or March he had in his store goods of the value of $3,000 to $4,000; and that twice in April about two weeks before the adjudication, he was seen between 12 o'clock at night and half-past 1 o'clock in the morning taking boxes, presumably with goods in them, away from his store to a covered wagon drawn by a horse, and that there was a light in his store at both of these times; and, further, that no money or property other than the merchandise and fixtures were turned over by the defendant to the receiver or the trustee. The evidence introduced by the defendant tended to contradict or explain the foregoing evidence introduced by the government.

Regarding the mortgage of February 2, 1909, Port, the government witness and mortgagee, further testified that he raised this money from people who owed him:

"Q. How did you raise the money? A. I raised it from my people, what they owed me.

"Q. You collected it from persons who owed it to you? A. I had one man owed me over $600.

"Q. Who was that? A. Slossberg in Portsmouth.

"Q. Did you get this money, $1000 or $1100 from your bank? A. No. I had it all with me, because Mr. Slossberg gave me that money."

Subsequently the defendant called Slossberg as a witness, who testified that on January 15, 1909, he owed Port $665. The witness was then asked the following question:

"I don't know as I will trouble to ask you what it was for, but state whether or not Mr. Port came to you at any time and said that he should need the money soon."

With respect to this question, the following appears from the record:

"Mr. Garland: I object. I don't see how any conversations between the witness and Port can possibly be competent.

"Mr. Emery: I think it would be as tending to show Mr. Port acted in good faith, that he was making preparations to have this money for Mr. Bean, and that he did let him have it as he testified.

"Mr. Garland: He has testified that he let him have it, and it is for the jury to say whether the story is true or not.

"Mr. Emery: Well, I didn't know but what you might say Mr. Port didn't have it.

"The Court: My impression is that it is not admissible. Do you ask me to exclude it?

"Mr. Garland: Yes.

"Mr. Emery: I offer to show by this witness, Louis Slossberg, that Morris Port came to him on the 15th of January, or thereabouts, 1909, and told him that he had agreed to let a man at Newburyport have some money; that he was going to lend him some money; that he wanted him to be ready pretty

soon to let him have what he owed him, and he told him he would let him have it if he would give him a few days' notice when he was ready, and on the 29th day of January Mr. Port came and got from him $665.

"The Court: I want to get your objection on the record in case we have to deal with it hereafter.

"Mr. Garland: I object to it on the ground that it has no tendency to prove or disprove any fact which is in issue here. The mere fact that this man may have paid money to Port some day previous to the day when Port says he paid a sum of money to the defendant does not seem to me to have any tendency to prove that he did pay it; it, to say the least, being an extraordinary proposition to attempt to corroborate a government witness on part of the government's case.

"Mr. Emery: I offer to show that last item.

"The Court: Without repeating anything you have already stated is there anything more, bearing on Mr. Garland's objection, in your offer of proof?

"Mr. Emery: No; except that I insist on my offer.

"The Court: The evidence offered is excluded by the court.

"Mr. Emery: Each item of it? It is divisible into two parts. I have stated it so.

"The Court: I do not see what more I can do except to say, 'the evidence offered,' whether you stated it in one statement or two, and the defendant excepts."

The first two assignments of error raise the question whether this evidence was properly excluded by the court.

The indictment charged the defendant with the concealment of property from his trustee, and, so far as appears from the record, the only substantial evidence tending to prove this issue was the evidence that the defendant was seen on two occasions removing goods from his store late at night. The record fails to show any evidence of the concealment of money or accounts. Upon the evidence as it stands, therefore, it is difficult to see the materiality of any of the testimony concerning this mortgage.

But, conceding that in some aspects of the case the evidence respecting the mortgage was relevant, what the defendant proposed to prove by Slossberg was plainly too remote to be material. The government had called Port, the mortgagee, who testified in detail respecting the mortgage, when the money was paid, and from whom it was obtained; and this evidence stood uncontradicted as a part of the government's case. The testimony of Slossberg in no way tended to contradict the government's evidence, but merely to corroborate it. It is said the government also claimed that the mortgage was fraudulent, and that this evidence tended to contradict this claim; but the difficulty with this proposition is that there is no evidence in the record tending to prove that the mortgage was fraudulent.

The first part of this excluded testimony, namely, what Port said to Slossberg about wanting the money he owed him, and that he had agreed to let a man in Newburyport have the money, was clearly inadmissible, since Port had already testified that he obtained this money from Slossberg, and this testimony is not rendered more trustworthy by what Port said to Slossberg about it. The second part of this excluded testimony, namely, that Slossberg paid the money to Port, may have been relevant, but, as the case stands upon the record, it was too remote to be material under all the circumstances of the case.

The exclusion of all this testimony may well be put upon the ground stated in Chase's Stephen's Evidence (2d Ed.) p. 6, as follows:

"Provided that the judge may exclude evidence of facts which, though relevant or deemed to be relevant to the issue, appear to him too remote to be material under all the circumstances of the case."

[2] 2. The remaining assignments of error relate to the exclusion of certain evidence concerning the shutters in defendant's store.

Newman, a witness for the government, testified, among other things, substantially as follows:

From the rear part of his building he could see the rear of the building of the defendant's house. Shortly before the defendant's failure, when he was in the rear part of his building, he saw some light in the back part of defendant's store—"just through the windows." He went over to see what it was, and saw a team just in front of the store, a horse and a wagon. He also saw some boxes there, and he saw these boxes put in the wagon. For a few minutes he watched these boxes put in the team. On another occasion, when he was in the front of his building, he saw some light in defendant's store, and he saw some boxes put on a team. One of these occurrences took place on a Friday night and the other on a Saturday night.

The defendant's store was about 100 or 125 feet from the witness' store.

David H. Weil, a police officer called by the defendant, testified that while the defendant kept store there the windows were all closed in the back part; in other words, that they were all closed except the front windows of the store. He further testified that the windows had shutters on the inside with bars across them, that he had been down there a number of times, and that he did not remember ever seeing the shutters off in the nighttime.

Bean, the defendant, testified that the shutters on all the windows in the store were always closed up during the time he occupied the store, except the two front windows; that the shutters were made of matched boards, with two cross-sticks, and located on the inside of the windows; and that no light could be seen through the shutters in the store. The defendant then called Charles W. Chandler, who testified that he had visited the store on November 18, 1909. The witness was asked the following question:

"Q. 1. How, at the time you were there in November, 1909, did you find these windows, whether they were covered or uncovered?"

The court excluded the evidence, and the defendant duly excepted.

The defendant, Bean, was then recalled to the stand, and asked the following questions by his counsel:

"Q. 21. Mr. Bean, during the time that you occupied the store at Ipswich, how much of the time were the shutters up at the side and the back windows?

"Mr. Garland: I thought we had gone into this.

"The Court: It has already been answered.

"Q. 22. Then I will ask you whether there was any change in the way that the shutters were put on the building from the time that you failed up to the 1st of last January?"

The government objected to the question, and defendant's counsel then made the following offer:

"Mr. Emery: I offer to show by this witness that there was no change in the keeping up of the shutters, or their manner of being kept up, from the time he went into the store until the 1st of last January, 1910, and then I propose to call Mr. Chandler and ask him how he found the shutters when he was there; how he found the windows covered."

This evidence was of the same remote character as the preceding evidence, and was properly excluded on the same ground.

The evidence related to the condition of the shutters in defendant's store. Shutters are not a permanent structure, but a structure which is subject to a change of condition at any time. It was proposed to prove by the witness Chandler that the shutters were up on November 18, 1909, and then to call the defendant, who would testify that there was no change in the keeping up of the shutters from the time he went into the store until January, 1910, although the evidence shows that the defendant vacated the store in May, 1909.

This evidence was certainly too remote and uncertain on the question whether it was possible for the government's witness, Newman, to have seen any light in the store in the preceding April on the two occasions referred to in his testimony.

The judgment of the District Court is affirmed.

ALDRICH, District Judge. I think the evidence offered, which in substance was that a light could not be seen through the back shutters, made of matched boards, which the evidence tended to show were always closed, was admissible as tending to contradict the witness Newman, who had testified that he did see a light; but the witness also testified that he walked around in front of the store, and, looking through the front windows, could see a light in the back part of the store, and that boxes were being loaded on to a team in front. While to my mind the evidence was competent as tending to discredit, its substance after all would depend largely upon whether the lights were in the same condition upon the different occasions and thus, at best, it was of an uncertain character, and, in view of the weight of the evidence against the defendant, it is clear that if it had been admitted it would not have influenced a verdict for the defendant. I therefore, upon the doctrine of harmless error, as expressed in Hunter v. State, 40 N. J. Law, 495, 542, concur in the result reached in the foregoing opinion.